# UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

---

DRW INVESTMENTS, LLC AND
DONALD R. WILSON, JR.

                          Plaintiffs,

     v.

U.S. COMMODITY FUTURES TRADING COMMISSION,

                          Defendant,

Case Number:
13 Civ. 6630

Assigned Judge:
Hon. Harry D. Leinenweber

Designated
Magistrate Judge:
Hon. Michael T. Mason

**ORAL ARGUMENT REQUESTED**

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

KOBRE & KIM LLP

Michael S. Kim (ND Ill Bar No. 2720985)
Andrew C. Lourie (ND Ill Bar No. 2164721)

800 Third Avenue
New York, New York 10022
Tel: +1 212 488 1200

Carolyn Gurland (ND Ill Bar No. 6274399)

2731 North Mildred Avenue
Chicago, Illinois 60614
Tel: +1 312 283 2109

*Attorneys for Plaintiffs DRW Investments, LLC and Donald R. Wilson, Jr.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF UNDISPUTED FACTS ....................................................................3

ARGUMENT......................................................................................................................3

A.     The Applicable Standard For Obtaining A Preliminary Injunction............................3

1.     DRW Is Likely To Succeed On Its Claim That It Lacked Fair Warning That Its Activity Would Be Regarded By The CFTC As Prohibited........................................4

2.     DRW Is Likely To Prevail On Its Claim That This Matter Is Ripe For Adjudication..............................................................................................................10

4.     The Requested Relief Is Justified Under The Remaining Standards........................13

CONCLUSION................................................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) .................................................................. 10

*Action for Children's Television v. FCC*, 59 F.3d 1249 (D.C. Cir. 1995) ......................... 10

*Apex Oil Co. v. DiMauro,* 713 F. Supp. 587 (S.D.N.Y. 1989) ............................................ 7

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979) ................................. 13

*Constantin v. Smith*, 57 F.2d 227 (D.C. Tex. 1932) ........................................................... 9

*Covino v. Patrissi*, 967 F.2d 73 (2d Cir.1992) .................................................................. 11

*Gates & Fox Co., Inc. v. OSHRC*, 790 F.2d 154 (D.C. Cir. 1986) (Scalia, J.) .................... 4

*General Elec. Co. v. U.S. EPA*, 53 F.3d 1324 (D.C. Cir. 1995) .......................................... 4

*Grande Pipeline Co. v. FERC*, 178 F.3d 533 (D.C. Cir. 1999) ........................................ 10

*In re DiPlacido*, C.F.T.C. No. 01-23, 2008 WL 4831204 (C.F.T.C. Nov. 5, 2008) ........... 5

*In re Indiana Farm Bureau Cooperative Ass'n*, 1982 WL 30249, *7
(C.F.T.C. Dec. 17, 1982) ..................................................................................................... 5

*Int'l Swaps and Derivatives Ass'n v. U.S. Commodity Futures Exch. Comm'n*,
887 F. Supp. 2d 259 (D.D.C. 2012) ..................................................................................... 8

*International Kennel Club Inc. v. Mighty Star, Inc.,* 846 F.2d 1079 (7th Cir. 1988) .......... 4

*Joelner v. Vill. of Washington Park, Illinois*, 378 F.3d 613 (7th Cir. 2004) ....................... 3

*Lerner v. Geldermann, Inc.*, 1991 WL 83497 at *7 (C.F.T.C. Jan. 9, 1991) ....................... 6

*Menominee Rubber Co. v. Gould, Inc.*, 657 F.2d 164 (7th Cir. 1981) .............................. 12

*Metro. Milwaukee Ass'n of Commerce v. Milwaukee County*, 325 F.3d 879
(7th Cir. 2003) .................................................................................................................... 10

*New Mexicans for Bill Richardson v. Gonzalez.* 64 F.3d 1495 (10th Cir. 1995) .............. 11

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373
(6th Cir. 1995) .................................................................................................................... 12

*Ty v. The Jones Group*, 237 F. 3d 891, 897 (7th Cir. 2001) ............................................... 4

*U.S. v. Chrysler Corp.*, 158 F.3d 1350, 1356 (D.C. Cir. 1998) .......................................... 4

*U.S. v. Radley*, 659 F. Supp. 2d 803 (S.D. Tex. 2009) ........................................................ 9

*Volkart Bros., Inc. v. Freeman*, 311 F.2d 52 (5th Cir. 1962) ............................................. 5

*Zinermon v. Burch*, 494 U.S. 113 (1990) ............................................................................ 5

**Statutes and Regulations**

17 C.F.R. § 151.2 ................................................................................................................ 8

7 U.S.C. § 13(a)(2) .............................................................................................................. 5

**Other Authorities**

11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2948.1, pp. 160–61 (1995) .......................................................................... 12

Cont, Mondescu and Yu, *Central Clearing of Interest Rate Swaps*: *A Comparison of Different Offerings* (March 11, 2001) ................................................................................ 6

**PRELIMINARY STATEMENT**

Plaintiffs DRW Investments, LLC and Donald R. Wilson, Jr. (collectively, "DRW") submit this Memorandum of Law in support of their Motion for a Preliminary Injunction against the U.S. Commodity Futures Trading Commission ("CFTC").

This case arises out of the CFTC's imminent civil enforcement action alleging that DRW violated the Commodity Exchange Act ("CEA") by placing orders from August 2010 through September 2011 ("the Relevant Period") relating to interest rate futures swap contracts offered by the International Derivatives Clearinghouse ("IDCH Contracts").[1] These orders were designed to generate profit if DRW were correct that, due to characteristics of IDCH Contracts, the IDCH Contracts *should* have been trading at a different yield than those of comparable uncleared over-the-counter (OTC) swaps.[2] The CFTC had never before promulgated any fair notice that such activity would be prohibited, and yet it now purports to try to punish DRW for it.

Given the applicable law, the CFTC's case must necessarily allege that DRW violated the CEA by placing orders relating to the IDCH Contracts intentionally to create an "artificial" settlement (i.e. closing) price[3]—that is, one not reflective of legitimate supply and demand. The fact that DRW knew its orders could be considered by IDCH in calculating the settlement price is insufficient to establish CEA manipulation, as courts have stated that a trader cannot be held liable for manipulation merely for affecting prices, unless there was an intent to create an

---

[1] Specifically, as explained in the Complaint, DRW placed orders to pay the fixed interest rate and receive the floating interest rate in IDCH Contracts.
[2] The products at issue here typically trade based on the contract's expected yield. For simplicity, however, the terms "price" or "market price" will be used in place of yield in this memorandum.
[3] Generally speaking, a "settlement price" is the average price at which a contract trades, calculated in different ways depending on context. Among other things, it determines whether a trader may be required to post additional margins (collateral).

1

"artificial" price.[4] For example, courts have recognized that trading to profit from speculation on price movements in an illiquid market is not inherently improper even though the trader may be aware that his orders will affect the pricing of the underlying asset. Indeed, even if DRW had at any time been the *sole* bidder in the IDCH Contract market, there was no prohibition on placing orders as long as there was nothing to indicate that such orders were otherwise manipulative.

Since the mere knowledge that one's orders will affect the settlement price is insufficient to constitute manipulation, the CFTC is expected to allege that the prices associated with DRW's orders were too divergent from some alternate measure of fair market value for IDCH Contracts. The only measure the CFTC has mentioned during its inquiry of DRW are comparable, uncleared Over-The-Counter (OTC) swaps. However, during or before the Relevant Period, the CFTC had never claimed that these were economically equivalent to IDCH Contracts (as an aside, in fact they are not economically equivalent, which was the very assumption underlying DRW's activity as explained above). Nor had the CFTC articulated any theory during the Relevant Period that it would be artificial to place orders for IDCH Contracts at prices that were divergent from those of comparable OTC swaps. Such a theory is especially unreasonable here, where the instrument being traded (IDCH Contracts) was a unique and complex derivative product with no clearly discernible reference for the calculation of "fair market value."

This matter is ripe for adjudication because the legal issue presented does not require resolution of material contested facts. It is undisputed that DRW placed the orders in question,

---

[4] Because of the period during which the relevant conduct occurred, the CFTC has acknowledged that this case would be subject to the law as it existed prior to the amendment of the CEA under the Dodd-Frank Wall Street Reform Act ("Dodd-Frank") and its implementation. Under that law, the CFTC was required to prove specific intent to act unlawfully as opposed to mere knowledge of the effect certain trading activity could have on market prices, *See In re Indiana Farm Bureau*, 1982 WL 30249, *7 (C.F.T.C. Dec. 17, 1982)**.** Nevertheless, as explained herein, the concern raised in this application about the lack of fair notice and vagueness persists even after the Dodd-Frank amendments, particularly now that the "specific intent" requirement has been eliminated so that knowledge that one's orders will have an impact on settlement price alone can arguably suffice.

that DRW knew that the orders could be used by IDCH to calculate the settlement prices for IDCH Contracts, and that the orders placed by DRW for IDCH Contracts were divergent from the market prices of comparable uncleared OTC swaps. Furthermore, it is undisputed that there was no rule, regulation or pronouncement that an interest rate swap future would be treated as economically equivalent to a comparable uncleared OTC swap such that orders for the swap future at a price divergent from the prevailing price for uncleared OTC swaps would be regarded as artificial. Adjudication of whatever factual issues will be implicated in the CFTC's imminent enforcement action against DRW is not relevant to the resolution of the threshold legal question implicated here – the fundamental lack of fair notice of the CFTC's position.

## STATEMENT OF UNDISPUTED FACTS

DRW relies upon and incorporates here the factual recitation of undisputed facts set forth in its Complaint. *See* Declaration of Michael S. Kim, Ex. 1.

## ARGUMENT

**A.     The Applicable Standard For Obtaining A Preliminary Injunction**

A movant for a preliminary injunction must show that: (1) it is reasonably likely to succeed on the merits; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondents will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. See *Joelner v. Vill. of Washington Park, Illinois*, 378 F.3d 613, 619 (7th Cir. 2004). In this Circuit, a party seeking a preliminary injunction "need only demonstrate at the preliminary injunction stage that it has a 'better than negligible' chance of succeeding on the merits so that injunctive relief would be

justified." *Ty v. The Jones Group*, 237 F. 3d 891, 897 (7th Cir. 2001) (citing *International Kennel Club Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1084 (7th Cir. 1988)).

    **1. DRW Is Likely To Succeed On Its Claim That It Lacked Fair Warning That Its Activity Would Be Regarded By The CFTC As Prohibited**

        **a. An Enforcement Action Would Violate DRW's Due Process Right To Receive Adequate Notice Of The Alleged Illegality Of Conduct Before It Occurs And To Be Free From Arbitrary And Unreasonable Government Conduct Directed At It And Others Like It**

The CFTC's purported implementation of the CEA is unconstitutional facially and as applied to DRW. Neither DRW nor any reasonable trader during the Relevant Period had fair warning of what standard the CFTC would use to determine whether orders for IDCH Contracts were manipulative because they were not designed to reflect a "fair price."

As courts have recognized, regardless "whether, in a *non-penal* context, the Commission's interpretation . . . might be permissible," in an *enforcement proceeding* "a regulation cannot be construed to mean what an agency intended but did not adequately express", since "statutes and regulations which allow monetary penalties against those who violate them . . . must give an [accused] . . . fair warning of the conduct [they] . . . prohibit[ ] or require[ ]." *Gates & Fox Co., Inc. v. OSHRC*, 790 F.2d 154, 156-57 (D.C. Cir. 1986) (Scalia, J.) (citations omitted)(emphasis added). The question is whether "[i]f, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform." *General Elec. Co. v. U.S. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (citation omitted); *see also U.S. v. Chrysler Corp.*, 158 F.3d 1350, 1356 (D.C. Cir. 1998) (notice of interpretation was inadequate where the regulation was silent on the question, the Federal Register Notice was too general and the agency had previously taken conflicting positions). The

4

U.S. Constitution has been construed to prohibit all government actions that are arbitrary and unreasonable. *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (observing that "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them").

During the Relevant Period, the CEA prohibited "[a]ny person [from] manipulat[ing] or attempt[ing] to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." 7 U.S.C. § 13(a)(2). "Manipulation" was described as "any and every operation or transaction or practice calculated to produce a price distortion of any kind in any market either in itself or in relation to other markets." *Volkart Bros., Inc. v. Freeman*, 311 F.2d 52, 58 (5th Cir. 1962). According to CFTC precedent, that general guidance proscribed, for example, the placing of orders that were uneconomically outside of prevailing market prices (*e.g.*, orders designed to lose money for the one trading it, and designed solely to influence the market price thereby). *See*, *e.g., In re DiPlacido*, C.F.T.C. No. 01-23, 2008 WL 4831204 (C.F.T.C. Nov. 5, 2008) (finding that violation of exchange bids and offers rule necessarily distorted the market price); *In re Indiana Farm Bureau Cooperative Ass'n*, 1982 WL 30249, *7 (C.F.T.C. Dec. 17, 1982) (holding that to prove the intent element it must be proven that the accused acted to create a price that did not reflect the legitimate forces of supply and demand). However, in an illiquid market such as the one for IDCH Contracts where there is no prevailing "market price", it was unclear whether any particular order could be prohibited because it was "too far" from the "fair price."

The CFTC did not indicate, either before or during the Relevant Period, that it would regard the market prices (yields) of comparable uncleared OTC swaps as the reference point for what is "fair value" for an interest rate swap future. Yet, the CFTC now claims that DRW's

5

orders for IDCH Contracts should have been at market prices that were similar to the prevailing market price for a comparable uncleared OTC swaps. The CFTC has thus applied the CEA in a way that effectively creates a new manipulation rule governing DRW's trading practices in illiquid markets. Under the CFTC's statutory construction of the CEA, orders for interest rate swap futures that are known to affect the settlement price for such futures, and that diverge by some unspecified threshold from the market prices for comparable uncleared OTC interest rate swaps, are intended to create an artificial price in the relevant interest rate swap futures market.[5]

DRW's awareness that its orders could affect the settlement price of the interest rate swap futures in question would not have alerted DRW to the allegedly illegal nature of its conduct. There is no basis in the CEA to say that one who places an order in a market knowing it could affect the settlement price is attempting to manipulate that market. As the CFTC itself has acknowledged, given that price is the aggregate of all trading occurring at that instant, *everyone* in a given market in theory has the ability to affect the market price, and the more illiquid the market, the greater the likelihood that a single trader or even a single trade would do so. *See Lerner v. Geldermann, Inc.*, 1991 WL 83497 at *7 (C.F.T.C. Jan. 9, 1991) (no evidence that rapid increase in potato futures contracts was result of manipulation) ("In a thin market the

---

[5] The reasonableness of the CFTC's using the price of comparable uncleared OTC swaps as the equivalent of "fair value" for illiquid interest rate futures is not directly at issue here (since the central issue here is lack of fair notice that it would do so). However, in fact, uncleared OTC swaps are not the economic equivalent of swap futures (unless adjustments are made), and the CFTC is misguided in any event in its "rule" that it plans to articulate in its imminent enforcement action. The pricing and valuation of new complex financial derivatives like the IDCH Contract is extremely difficult. DRW placed the orders for IDCH Contracts in the manner it did because, after extensive analysis of the IDCH Contract, it determined that the market prices of the IDCH Contract should be different than those of comparable uncleared OTC swaps. According to DRW, its analysis reflected that this divergence in pricing in the two markets was as a result of the differences between variation margin for futures contracts that are centrally cleared, on the one hand, and collateral for uncleared swaps traded directly between counterparties, on the other hand. The IDCH Contract had failed to take this into account in the manner it was designed, and therefore provided a legitimate opportunity for a trader to profit by correcting this inefficiency. *See* Cont, Mondescu and Yu, *Central Clearing of Interest Rate Swaps*: *A Comparison of Different Offerings* (March 11, 2011) *available at* SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1783798.

trading activity of any participant is apt to move the price, but this is not necessarily 'manipulation.'"). The CFTC has never stated that orders that affect prices are inherently illegal. Indeed, Courts have concluded that open market trading that affects prices cannot be inherently illegal. For example, in *Apex Oil Co.* v. *DiMauro,* the court held that "Apex correctly argues that it cannot be held liable if futures or wet market prices dropped simply because of its sale of short contracts." 713 F. Supp. 587, 606 (S.D.N.Y. 1989).

Indeed, as the previously discussed authorities reflect, courts have held that to constitute actionable CEA manipulation, a trader has specifically to intend to create an "artificial" price – that is, one not reflective of supply and demand. A typical example is making a bid (offer to buy) that is higher than the prevailing ask (offer to sell) in a liquid market, or an ask (offer to sell) that is lower than the prevailing bid (offer to buy), both of which would be in themselves economically irrational and thus could only be explained as conduct intended purely to move the price in contravention of natural market forces to benefit other trading positions. Another example (prohibited after Dodd-Frank) is the selling or buying of large volumes of futures contracts during the settlement period solely to benefit offsetting swaps or other financial derivative positions on a different trading platform and not to obtain profits in the relevant futures market itself (a practice known as "banging the close"). Likewise, fraud, deception or violation of clearly defined exchange rules or other laws in the course of entering non-fictitious trades has been characterized as manipulative under the CEA.

Here, however, there is no dispute that DRW's orders were aimed at effectuating arms-length transactions with counterparties who had access to the same market information as DRW. Trading to profit from price movements in an illiquid futures market has never been defined as manipulative and, as noted, is what speculators do in such a market.

7

In particular, the CFTC has still not promulgated any guidance as to whether the market price of an uncleared OTC swap should be considered a "fair" prevailing "price" and thereby a limitation on the orders relating to a comparable interest rate swap future. In fact, the potential *difference* in the economic substance of at least certain swap futures and comparable uncleared OTC swaps was noted by the CFTC itself, but it did not go on to address the problem it recognized. After Dodd-Frank went into effect (and also after the Relevant Period), the CFTC acknowledged the need to establish rules addressing "the meaning and parameters of 'economically equivalent swaps'" that must be used by clearing organizations to meet reporting and other obligations. *See* Press Release, CFTC Staff Public Roundtable to Discuss the "Available to Trade" Provision for Swap Execution Facilities and Designated Contract Markets (Jan. 30, 2012) *available at*: www.cftc.gov/PressRoom/Events/opaevent_cftcstaff013012 (announcing that CFTC staff would have a public roundtable to discuss proposed rules designed to implement amendments to the CEA). Only *after* the Relevant Period, the CFTC ultimately issued a final rule addressing futures and swaps (17 CFR § 151.2 ("Position Limits for Futures and Swaps")), but even that rule did not directly address this issue because it only purported to establish the circumstances under which *commodity* swap futures contracts would be considered economically equivalent to a comparable OTC swap for position limit purposes.[6] Consequently, it still remains unclear what standard applies to the issue of economic equivalence between uncleared *financial* swaps and futures contracts.

As this history reflects, there was no statutory provision or agency regulation, rule or pronouncement before or during the Relevant Period providing any guidance as to how the CEA's manipulation prohibition would be construed for purposes of determining the legality of

---

[6] Incidentally, certain aspects of the rule were subsequently struck down by the U.S. District Court in Washington, D.C. as economically unnecessary and not required by the amended CEA. *Int'l Swaps and Derivatives Ass'n v. U.S. Commodity Futures Exch. Comm'n*, 887 F. Supp. 2d 259 (D.D.C. 2012).

orders in a new financial market product such as the IDCH Contract. Discovering what the "fair" price of such a product should be is difficult because the markets created by these products are usually illiquid with only a few market participants, and therefore no reliable "market price."

As the cases above reflect, when the government threatens to deprive a party of a constitutional right, Courts have been willing to determine whether the conduct should be enjoined. *See*, *e.g.*, *Constantin v. Smith*, 57 F.2d 227, 235, 242 (D.C. Tex. 1932) (finding no authority that would preclude "a United States court . . . by injunction[ ] [from] prevent[ing] the deprivation of property such as is here occurring" and enjoining government from enforcing against plaintiffs "any of their so-called military orders already passed or to be passed, regulating or restricting the production from their [oil] wells, and from in any manner interfering with the lawful production of oil from plaintiffs' property").

At least one federal court has recently recognized that the nebulous concept of market manipulation under the CEA can be applied in an unconstitutionally vague manner. *See U.S. v. Radley*, 659 F. Supp. 2d 803, 813-14 (S.D. Tex. 2009) (holding that Defendants' alleged conduct in trading in the propane futures market, to profit based on movements in price of propane, was a legitimate commercial purpose and had never been clearly prohibited as causing an artificial price and, thus, the CEA's prohibition of price manipulation was unconstitutionally vague as applied to defendants). As *Radley* recognized, trading for profit is not in itself manipulative, nor is it manipulative to trade despite knowing that the trades will affect the settlement price for the underlying commodity.

Accordingly, the CFTC's construction of the CEA's anti-manipulation provision is unconstitutional both facially and as applied to DRW under the circumstances here, and there is a

strong likelihood and certainly more than a "negligible chance" as required by law of DRW prevailing on this claim of lack of fair notice.

## 2. DRW Is Likely To Prevail On Its Claim That This Matter Is Ripe For Adjudication

To demonstrate ripeness in a pre-enforcement challenge, a plaintiff must show that the issues are fit for judicial decision and that the plaintiff will suffer a hardship if the court withholds consideration. *See Metro. Milwaukee Ass'n of Commerce v. Milwaukee County*, 325 F.3d 879, 882 (7th Cir. 2003). Hardship is established if (1) enforcement is certain, only delayed, OR (2) even if the enforcement is not certain, the mere threat of future enforcement has a present concrete effect and a later challenge will cause irremediably adverse consequences. *Id.*; s*ee also Abbott Labs. v. Gardner*, 387 U.S. 136, 150-54 (1967) (recognizing that hardship need not take the form of an actual enforcement action; the threat of enforcement is sufficient because the law is in force the moment it becomes effective and a person made to live in the shadow of a law that she believes to be invalid should not be compelled to wait and see if a remedial action is coming).

The first requirement – that the issues are fit for judicial decision – is satisfied here. "When a petitioner raises a purely legal question," the Court "assume[s] that issue is suitable for judicial review." *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 550 (D.C. Cir. 1999) (internal quotation marks omitted). DRW's claims are plainly ripe under this standard. The issues presented here are purely legal, and this dispute "would look no different, be more ripe if you will, were the Court to put off review until another day." *Action for Children's Television v. FCC*, 59 F.3d 1249, 1258 (D.C. Cir. 1995). In particular, Courts have recognized that "the arguable vagueness of a [governmental] statute," regulation, rule or policy "greatly militates in

favor of finding [even] an otherwise premature controversy to be ripe." *New Mexicans for Bill Richardson v. Gonzalez.* 64 F.3d 1495, 1503 (10th Cir. 1995). Because the claims are fit for immediate review, the Court need not consider the hardship to DRW of withholding it. *Id.*

With respect to the second requirement, the CFTC has indicated that it intends to file an enforcement action imminently. Thus, enforcement is certain and only a matter of time. Silberberg Decl. ¶ 7. Such enforcement action violates DRW's constitutional right to fair notice of prohibitions on conduct before such conduct occurs which, as noted below, satisfies the injury element for an injunction. In addition, the CFTC's threatened enforcement action is already having a concrete effect in injecting great uncertainty into the survivability of certain businesses within DRW. As reflected in the supporting Declaration of Craig Silberberg, the filing of a CFTC enforcement action would visit immediate and irreparable hardship on DRW.

> 3. **Apart from Irreparably Depriving DRW Of Its Constitutional Rights, The Filing Of The Enforcement Action Would Subject DRW To Hardships That Would Cause It Immediate And Irreparable Harm**

Courts have recognized that the deprivation of constitutional rights sufficiently demonstrates a likelihood of irreparable harm in itself. *See*, *e.g. Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744 (2d Cir. 2000) (finding in an Equal Protection case that "when an alleged deprivation of a constitutional right is involved, most courts hold no further showing of irreparable injury is necessary," and refusing to limit this principle to First Amendment cases); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir.1992) (holding that "given the fundamental right involved, namely, the right to be free from unreasonable searches" the plaintiff had sufficiently shown likelihood of irreparable harm for preliminary injunction purposes); *Cerro Metal Prods. v. Marshall*, 620 F.2d 964, 974 (3d Cir.1980) (holding that "an [OSHA] inspection violating the Fourth Amendment would constitute irreparable injury for which injunctive relief would be

appropriate"); 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2948.1, pp. 160–61 (1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

Nevertheless, the facts here provide an independent basis for finding a likelihood of irreparable harm. DRW provides liquidity in many illiquid markets in which its orders can affect the determination of settlement prices. Specifically, DRW Investments is registered as the designated primary market maker in variance swap futures contracts on the CBOE Futures Exchange, DRW Investments and its predecessors have been providing liquidity in Eurodollar Options since 1992, and an affiliate of DRW Investments has been providing liquidity in Natural Gas Options since 2002. DRW is currently forced to participate in these markets in the shadow of an arbitrary enforcement policy that exposes it to sanctions for trading in such markets. Silberberg Decl. ¶ 15. If the imminent enforcement action is filed and the CFTC formally adopts in an accusatory document its theory of wrongdoing described above, DRW Investments and its affiliates will be forced to close those business lines that involve providing liquidity to illiquid markets. The imminent enforcement action will thereby completely destroy certain lines of business of DRW. *Id.* Courts have consistently held that the destruction of a business, whose lost profits are inherently incalculable, constitutes irreparable harm. *See Menominee Rubber Co. v. Gould, Inc.*, 657 F.2d 164, 167 (7th Cir. 1981) (holding that "[t]he loss of goodwill and the disruption of MRC's business resulting from its termination is substantial and sufficient to constitute 'irreparable harm.'"); *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995) (holding that the potential economic collapse of a business was sufficient to show irreparable harm for the purposes of a preliminary injunction); *see also* 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, §

2948.1 at pp. 160–161 (observing that "when the potential economic loss is so great as to threaten the existence of the moving party's business, then a preliminary injunction may be granted, even though the amount of direct financial harm readily is ascertainable").

### 4. The Requested Relief Is Justified Under The Remaining Standards

In assessing the public interest element, the Court should consider that the CFTC's application of the CEA's market manipulation prohibition in the context of its imminent enforcement action will create substantial uncertainty in financial derivative markets. Such an action would indicate to market participants that if they are placing orders in an illiquid market for a relatively new swap futures contract or similar financial derivative, they may be accused of manipulation at the CFTC's whim based on an unpublished definition of what type of orders are prohibited. This in turn will inhibit the type of detection and correction of inefficiency that DRW's trading activity accomplished, and ultimately discourage trading and undercut the public's interest in bringing liquidity to illiquid financial markets.

As Courts have recognized, a plaintiff "should not have to risk prosecution, under a statute whose scope is unclear, before his challenge to the constitutionality of that statute is ripe." *Id. See also Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 303 (1979) ("If the provision were truly vague, appellees should not be expected to pursue their collective activities at their peril.").

Finally, with respect to the relative burden imposed on the parties, as reflected above, while the same facts establishing hardships faced by DRW also reflect that at least some of these would be not only immediate but irreparable, granting the requested relief would impose no hardship or burden on the CFTC. The agency could bring its enforcement action at the conclusion of this case if the Court resolves the legal issue raised by DRW in a manner that

13

makes this permissible. Accordingly, we submit that the remaining requirements for obtaining a preliminary injunction are satisfied.

## CONCLUSION

For the foregoing reasons, DRW requests that this Court grant its motion for a preliminary injunction enjoining the CFTC from bringing a market manipulation enforcement action against DRW in connection with the IDCH Contract during the pendency of this case.


Dated: Chicago, Illinois
      September 18, 2013

                              KOBRE & KIM LLP
                              By: s/ Michael Kim
                              Michael S. Kim (ND Ill Bar No. 2720985)
                              *Michael.Kim@KobreKim.com*
                              Andrew C. Lourie (ND Ill Bar No. 2164721)
                              *Andrew.Lourie@KobreKim.com*

                              800 Third Avenue
                              New York, New York 10022
                              Tel: +1 212 488 1200

                              Carolyn Gurland (ND Ill Bar No. 6274399)
                              *Carolyn.Gurland@KobreKim.com*

                              2731 North Mildred Avenue
                              Chicago, Illinois 60614
                              Tel: +1 312 283 2109

                              *Attorneys for Plaintiffs DRW Investments, LLC and Donald R. Wilson, Jr.*


*Of Counsel*

Melanie L. Oxhorn, Esq., Kobre & Kim LLP
Jason Sharma Manning, Esq., Kobre & Kim LLP